1  Nolan Kennedy, Esq. (SBN 57478)
   David W. Balch, Esq. (SBN 226519)
2  KENNEDY, ARCHER & HARRAY
   Attorneys at Law
3  24591 Silver Cloud Court, Suite 200
   Monterey, California 93940
4  Telephone:    (831) 373-7500
   Facsimile:    (831) 373-7555
5
   Attorneys for Plaintiff
6  CENTRAL COAST BRAIN AND SPINE

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  CENTRAL COAST BRAIN AND SPINE          CASE No. _____
    PROFIT SHARING PLAN,
12
                  Plaintiff,              COMPLAINT FOR DAMAGES FOR
13                                        SECURITIES AND ERISA VIOLATIONS;
                                          BREACH OF FIDUCIARY DUTY; FRAUD
14        vs.

    CHRIS DAWSON and DOES 1 to 15,
15  inclusive,                            DEMAND FOR JURY TRIAL

16                Defendants.
    _____/
17

18                     GENERAL ALLEGATIONS

19
        1.      This action arises under Section 12 of the 1933 Securities Act (15 U.S.C. § 77l);
20
    Section 10 of the 1934 Securities Exchange Act  (15 U.S.C. § 78j) and Rule 10-b(5) promulgated
21
    thereunder, and the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001, *et seq.*).
22
    This Court has jurisdiction of the federal claims under 28 U.S.C. § 1331.  This court has supplemental
23
    jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.
24
        2.      Plaintiff CENTRAL COAST BRAIN AND SPINE PROFIT SHARING PLAN
25
    ("Plaintiff") is the successor-in-interest to the Central Coast Brain and Spine Money Purchase
26
    Pension Plan (the "CCBS Plan").  The CCBS Plan, at all times relevant hereto was an ERISA-
27
    qualified pension plan for Central Coast Brain and Spine, a medical corporation with its principal
28

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

1  place of business in Salinas, California.  Four doctors were the trustees of the CCBS Plan (and are

2  currently trustees of Plaintiff): Drs. Wahl, Carver, Kaczmar, and Halamandaris.

3      3.      Defendant CHRIS DAWSON ("Defendant" or "Dawson") is and at all times relevant

4  hereto was and is an resident of the county of San Benito, California.

5      4.      The true names or capacities, whether individual, corporate, associate or otherwise, of

6  defendant(s) named in this action as Does 1 through 15, are unknown to Plaintiff, and Plaintiff

7  therefore sues these defendant(s) by such fictitious names.  Plaintiff will amend this Complaint to

8  show the true names and capacities of the fictitiously-named defendant(s) as they become ascertained.

9      5.      Plaintiff is informed and believes, and thereon alleges, that each of these

10  fictitiously-named defendant(s) is responsible in some form or manner for those acts or omissions

11  herein alleged, and that Plaintiff's damages and other injuries as herein alleged were proximately

12  caused by said acts or omissions.

13      6.      Plaintiff is informed and believes, and thereon alleges, that at all times mentioned

14  herein, unless specifically alleged otherwise, each defendant(s) herein was the agent and/or employee

15  of each remaining defendant(s) and was acting within the scope and purpose of said agency and/or

16  employment.

17      7.      Venue is proper in this Court because all parties to this action reside within the

18  Northern District of California and all events, statements, and solicitations at issue in this lawsuit

19  occurred within the Northern District of California.

20                          **STATEMENT OF FACTS**

21      8.      As discussed in greater detail below, this lawsuit concerns pension fund investments

22  made by the CCBS Plan upon the advice of its regular financial advisor, Chris Dawson.  In particular,

23  Dawson convinced the CCBS Plan trustees to invest $665,000 of the CCBS Plan's pension money in

24  a risky, unregistered security known as viatical settlements.  In recommending this investment to his

25  client, Dawson made several material misstatements and/or failed to conduct even the most cursory of

26  investigations into this proposed investment, which would have revealed the risky nature of the

27  investment.  In reliance on Dawson's fraudulent advice, the CCBS Plan invested in the viatical

28  settlements, and has lost a substantial amount of money as a result.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    2                    CCBS Plan v. Dawson
Case No. _____

9.      For all times relevant to this Complaint, Dawson was registered as an investment adviser and broker-dealer with the California Department of Corporations' Securities Regulation Division and he was registered as a Certified Financial Planner with the California Certified Financial Planner Board of Standards.

A.      **The CCBS Plan's Investment in Viatical Settlements**

10.      At all times relevant hereto, Dawson was the CCBS Plan's financial advisor.  By the late 1990's Dawson was regularly providing investment advice to the CCBS Plan – particularly with respect to the CCBS Plan's pension investments.  For example, prior to the incidents at issue in this lawsuit, the CCBS Plan held the majority of its pension funds in SEI Investments (a family of mutual funds and individual stocks).  It was Dawson, in his role as a broker for SEI Investments and financial advisor to the CCBS Plan, who convinced the CCBS Plan to make the investment and facilitated the investment.  Dawson received a monetary commission for brokering that transaction.

11.      From the time that the CCBS Plan made its investment in SEI, Dawson was active in monitoring the CCBS Plan's SEI portfolio.  In late 2000, Dawson became concerned that the CCBS Plan's investment in SEI was performing poorly, due to (i) heavy investment in volatile emerging markets investments, and (ii) lack of adequate market diversification.  As such, from January through August 2001, Dawson – in his role as the CCBS Plan's financial advisor – had three meetings with the CCBS Plan's pension fund trustees (Drs. Wahl, Carver, Kaczmar, and Halamandaris) to rectify that issue.

12.      First, at the April 2, 2001, the CCBS Plan quarterly corporate meeting, the topic of the CCBS Plan's pension investment was discussed.  At the meeting, Dawson addressed the group as to the status of the CCBS Plan's pension portfolios and the stock market in general.  Dawson informed the CCBS Plan that the pension portfolios were down 10% from January 2001 and 25% from the previous year.

13.      At that point, the CCBS Plan's pension fund contained approximately $3.2 million worth of assets and was invested 60% in stocks and 40% in bonds.  Moreover, approximately $600,000 of those investments were in high yield or emerging market debt and emerging market equity.  At the April 2 meeting, Chris Dawson recommended that the CCBS Plan eliminate those

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                                3

CCBS Plan v. Dawson
Case No. _____

1  investments and move the $600,000 to a different investment.  He gave two reasons for his

2  recommendation: the emerging market debt and equity investments (i) were extremely volatile and a

3  risky investment, and (ii) too closely tracking the ups and downs of the broader stock market, and

4  thus was not a sufficient hedge against a market downturn.

5         14.    As a result, Dawson recommended that the CCBS Plan invest that money in a new

6  investment: viatical settlements.  A viatical settlement is a life insurance policy of a terminally ill

7  person (the viator) that is sold at a price less than the face value of the policy.  Investors pay the

8  premiums, and realize a profit if the policy matures within an expected amount of time.  Thus, each

9  party to the settlement transaction receives a benefit.  The insured, or viator, receives a portion of the

10 proceeds of his life insurance policy as a lump sum.  The investor receives the face value of the life

11 insurance policy when the viator dies.  The purchase price of the policy is based upon the life

12 expectancy of the viator: the longer the viator is projected to live, the lower the purchase price of the

13 policy, and the shorter the viator is projected to live, the higher the purchase price.

14        15.    At that point in the meeting, Dawson told the CCBS Plan trustees about Viatical

15 Capital, Inc. d/b/a Life Settlement Network ("VCI"), which was offering membership interests in

16 LLCs that purchased, sold, and traded viatical settlements.  He informed the CCBS Plan that an

17 investment in a VCI-sponsored LLC would yield an approximately 18% return and was an extremely

18 safe investment.  In fact, Dawson "guaranteed" double digit returns.

19        16.    Dawson gave three general reasons for his "guarantee": (i) VCI very carefully

20 screened potential policies, and purchased only 4 out of every 100 policies researched; (ii) if a person

21 failed to die within 90 days after their expected life span, then the CCBS Plan could sell the policy

22 back to VCI (which would diminish the rate of return to approximately 15-17%); and (iii) each LLC

23 was required to have sufficient insurance to cover losses in the investment.

24        17.    Dawson closed his presentation by noting that VCI investors "don't lose."  He noted

25 that viatical settlements could generate such large returns because they were not widely known or

26 accepted in the industry, but that within 2 to 3 years, they would become common (and less

27 rewarding) investments.  He urged the CCBS Plan to invest while the double digit returns were still

28 possible.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES     4

CCBS Plan v. Dawson
Case No. _____

18.     At the meeting, Dawson handed out to the CCBS Plan trustees a VCI pamphlet entitled "Improving the Quality of Life." (A true and correct copy of this document is attached hereto as Exhibit A.) In this pamphlet, VCI represented that viatical settlement investments were "stable" and that due to the "safety of the insurance industry ratings, and procedures for policy sellers, there can be no default on payment on policies, only delay." VCI also represented that it would "utilize the industry's stringent security criteria in place provided by medical utilization review companies, Triage physician board review, insurance carriers, due diligence, and others" to select the most appropriate policies for purchase.

19.     Second, at some point in May or June 2001, Dawson had a meeting with Dr. Kaczmar to discuss the potential VCI investment. The meeting lasted approximately one hour. Dawson again reiterated that the investment made sense because the stock market was continuing its downward trend and this investment gave the CCBS Plan a chance to offset its losses. Dawson also clarified certain of the investment mechanics, including telling Dr. Kaczmar that the VCI-sponsored LLC in which the CCBS Plan invested would own the viatical settlements (and not just a right to the proceeds), that the CCBS Plan would own shares in the LLC, and that the CCBS Plan would be the dominant shareholder in its investment LLC.

20.     Dawson then told Dr. Kaczmar that several other companies sold viatical settlements and he noted that "you may have heard about problems with these investments in the past." (Dawson did not go into detail about the problems with previous viatical investments.) Nonetheless, he reassured Dr. Kaczmar that an investment with VCI was safe. Dawson noted that (i) VCI researched its viatical policies heavily and relied only on undisputed medical facts in making its purchase decisions; (ii) VCI personnel had been in the insurance industry for 25-30 years and were familiar with the issues raised by viatical settlements; and (iii) VCI would not invest in insurance policies owned by AIDS patients, due to the unpredictability of determining the likely life span.

21.     During that meeting, Dawson told Dr. Kaczmar that the LLC in which the CCBS Plan invested would own a package of insurance policies, and as each policy paid off, the LLC would receive the return. Dawson noted that the LLC would receive a return on all the policies. Dawson also reiterated that the LLCs would receive a 17-18% return on investment, but that if the CCBS Plan

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    5

CCBS Plan v. Dawson
Case No. _____

wanted a safer investment, it could have secondary insurance on the policies (in which case, if a person did not die, the insurance company or VCI would pay off the policies), which would result in a decrease rate of return of approximately 15%.

22.     At the meeting, Dr. Kaczmar noted that most insurance policies have an accelerated payment provision in the event a person is diagnosed with a terminable illness, thereby negating the benefit of a viatical settlement.  Dawson responded that VCI was able to research and find older policies that did not contain such an accelerated payment provision.  Dr. Kaczmar also noted that, if the LLC could make a 15% return, then VCI must purchase the policies for approximately 50 cents on the dollar, and Dawson responded that he thought that was true.

23.     Dawson closed the meeting on a positive note by contending that this was a very safe investment.  Dawson told Dr. Kaczmar that "I've done my due diligence and these guys are not fly-by-night."  He noted that the only real risk in this investment was if VCI, York, and Coyne "took the money and went to South America."

24.     Third, Chris Dawson discussed the VCI investment at the August 1, 2001, CCBS Plan quarterly corporate meeting.  His presentation was along the lines of his previous presentations.  He explained how VCI functions, including the fact that the portfolio had a four-year maturity.  He suggested that the CCBS Plan invest approximately $700,000 into an insured growth portfolio with VCI, with a return on investment of 15-16%.

25.     Prior to purchasing any interest in the VCI-created LLC, Dawson provided the CCBS Plan with a copy of the operating agreement for the LLC.  Pursuant to the operating agreement, all members would be actively involved in the investment decisions made by the LLC, including decisions as to the policies to be bought and sold by the LLC.

26.     At the meeting, on the basis of Dawson's presentations and on his advice, Drs. Wahl, Carver, Kaczmar, and Halamandaris, as trustees of the CCBS Plan, agreed to transfer $665,000 of the CCBS Plan's pension funds to an LLC set up by VCI known as Life Investment Funding Enterprise L.L.C.-IG-2.  The purchase was actually effected on August 10, 2001.  Dawson received a monetary commission for brokering this transaction.

**B.      Dawson's Material Misstatements / Omissions**

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

6

CCBS Plan v. Dawson
Case No. _____

1.   Misrepresentations Concerning Management of LLC

27.   According to the VCI operating agreements provided by Dawson, the LLCs were to be "managed by its members."  In practice, however, York and Coyne exercised virtually total control over each aspect of the management of the LLCs. It was VCI that evaluated and purchased, on behalf of the LLCs, the life insurance policies from terminally ill policyholders through viatical settlement providers. VCI also managed the accounts, books and records of each of the LLCs, issued the quarterly statements and other correspondence to investors, and proposed and drafted proxy materials.

28.   In addition, VCI provided the LLC members with little information regarding the policies, failed to provide the insureds' medical information, and regularly denied investors access to books and records. As most investors had no background or expertise with viatical settlements and were otherwise denied information regarding the policies, investors were incapable of running the LLCs as they had no basis to evaluate and analyze the underlying investments.

29.   Finally, York and Coyne held signatory authority on each LLC's bank account while no single investor had any signatory authority.  York and Coyne controlled the movement of funds of each LLC, including the undisclosed movement of funds: (i) from one LLC to another, (ii) from various LLCs to VCI or the Organizers.

2.   Misrepresentations Concerning Ownership of the Viatical Settlements

30.   Dawson informed the CCBS Plan that all of the VCI-created LLCs (including LLC-IG-2, in which the CCBS Plan invested) actually owned the viatical settlements that comprised that LLC's assets.  In addition, to give the appearance of ownership, VCI prepared and disseminated quarterly statements to investors that listed the LLC's purported portfolio of viatical settlements. The statements identified the underlying policies, listed the purchase price, provided historical information on the sale or maturity of the policies, stated a current valuation of the portfolio, and included an expected rate of return.

31.   Dawson's representation was wrong.  For example, many of the viatical settlements allegedly belonging to the LLCs had been rescinded, cancelled, terminated or had lapsed.

32.   Moreover, the LLCs often did not have actual ownership of the polices.  York and

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES          7          CCBS Plan v. Dawson
Case No. _____

Coyne set up a company named Resource Funding Group, Inc. ("RFG") that became the only licensed provider of viatical settlement policies. Once the settlements were purchased, they were placed in a trust entitled the RFG Trust. RFG was the grantor and is the beneficiary of the RFG Trust. As such, RFG is the beneficial owner of the policies – not the LLCs. Upon information and belief, the CCBS Plan believes that the majority of policies in LLC-IG-2 were never in fact owned by the LLC but were in fact beneficially owned by RFG.

>   3.   Misrepresentations About the Insurance Coverage for the Viatical Settlements

33.   As stated above, one means by which Dawson convinced the CCBS Plan that the VCI investment was safe was by telling the CCBS Plan that their investment was insured against loss through third-party insurance companies. That statement was false. LLC-IG-2 may be an Indirect Beneficiary to one bond in the amount of $3 million. The surety is International Fidelity & Surety Limited, a Republic of Vanuatu-domiciled insurance company. (Vanuatu is an offshore tax haven located off the coast of Australia.) Unfortunately, the bond only insures payment for one of LLC-IG-2's purported life insurance policies.

34.   More importantly, however, the bond lists RFG and RFG Trust as the Trust Agent and Direct Beneficiary of the bond. In the language of the bond instrument, the Direct Beneficiary is directed to execute a Statement of Irrevocability in favor of the Indirect Beneficiary (LLC-IG-2). Plaintiff does not believe that any such Statement of Irrevocability has been executed or, if so, that it has any legal effect. Further, the bond has not yet matured, and it states that surety is only obligated to pay on the bond if the Senior (original insured) is alive at the end of the fourth year, or seventy-two months from the Senior Settlement Date (December 26, 2000).

35.   Finally, apart from this one bond insuring one of the 17 policies held by LLC-IG-2, there does not appear to be any bond or other insurance protecting the other 16 policies.

>   4.   Dawson's Misrepresentations About VCI's Performance and Risk

36.   Dawson misrepresented the risk level of the VCI investment. As noted above, in discussing this investment, Dawson used terms like "stable" and "very safe" and he noted that VCI investors "don't lose." He told the CCBS Plan that it could expect returns between 15-18% and that double-digit returns were "guaranteed." Dawson specifically told Dr. Kaczmar during their lunch

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                                    8

CCBS Plan v. Dawson
Case No. _____

1   meeting that he had performed due diligence on York, Coyne, and VCI, and he concluded that VCI

2   and its principals were not "fly by night."

3       37.     Dawson had no basis for claiming these anticipated returns.  Not only was the

4   investment extremely risky, but in actuality, VCI, York, and Coyne were engaged in a ponzi-like

5   scheme that should have been discovered by Dawson had he performed even the most rudimentary

6   due diligence.

7       38.     First, the VCI investment, by it nature, was risky.  Viatical settlements are inherently

8   unpredictable, and the rate of return is directly affected by the timing of the viator's death.  If he

9   outlives his expected lifespan, then the LLC would lose money on that policy because it would

10  continue to pay the premiums on that policy until the viator died.  Moreover, as noted above, Dawson

11  informed the CCBS Plan that their investment was safe in part because it was insured, when in fact it

12  was not.

13      39.     Finally, VCI increased the risk of this investment by purchasing "contestable" policies.

14  A policy is contestable – and rescindable – if the insurance company determines within the first two

15  years after issuance that the policy was improperly obtained.  One basis for rescinding a policy is to

16  discover that the application was "cleansheeted" – i.e. a person denied having a particular condition

17  or history, when in fact that person does.  Unfortunately, VCI purchased a substantial number of

18  cleansheeted policies.

19      40.     Second, it appears that much of the return-on-investment information was generated

20  by VCI through a ponzi-like scheme.  In particular, VCI, York, and Coyne routinely recommended

21  that the LLCs sell specific policies in their portfolio (typically from an earlier formed LLC to a more

22  recently formed LLC whereby new investor money was reported as a "profit" to the old investors).

23  By engaging in these transactions, VCI created the false appearance of profits by simply selling a so-

24  called "appreciated" policy from one LLC portfolio to another LLC.

25      41.     Third, VCI had a standard twenty percent administrative fee (though the actual fee

26  charged by VCI often exceeded that amount).  Though this greatly decreased the value of the

27  investment, Dawson failed to inform the CCBS Plan of this fact.

28      42.     Fourth, Dawson's reassurance that his due diligence confirmed that VCI was not a

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    9                    CCBS Plan v. Dawson
                                                             Case No. _____

1  "fly-by-night" operation was patently untrue.  From 1998 through 2002, six state regulatory

2  authorities issued cease-and-desist orders against VCI, York, Coyne, VCI-related entities and/or

3  LLCs.  Dawson never informed the CCBS Plan about those cease-and-desist orders, which would

4  have cast the investment in a significantly different light.

5  43.   Fifth, Dawson represented that the VCI investment was fit for the CCBS Plan, given

6  its investment goals.  Dawson knew that the CCBS Plan was looking for a conservative investment

7  that would diversify its investment portfolio.  Dawson, knowing the investment goals of the CCBS

8  Plan, represented that the VCI investment was a suitable investment.  In truth, the VCI investment

9  was an extremely risky investment that was not suitable for the CCBS Plan.

10 **C.    Dawson's Deliberate Recklessness or Conscious Misconduct**

11 44.   In making the material misstatements identified above and/or by omitting material

12 information required to make his statements not materially misleading, Dawson acted with conscious

13 misconduct towards the CCBS Plan and/or he was deliberately reckless as to the truth or falsity of the

14 information he provided to the CCBS Plan.

15 45.   In an effort to ease the CCBS Plan's concerns over their investment in VCI, thereby

16 earning a commission on the transaction, Dawson informed the CCBS Plan that he had conducted

17 "due diligence" into the background of VCI and there was no cause for concern.  That statement was

18 deliberately false.  In fact, Dawson conducted no (or very little) due diligence into the background of

19 VCI and little to no research on viatical settlements in general.

20 46.   If Dawson had performed the due diligence he claimed to have performed, he would

21 have discovered that: (i) viatical settlements are inherently risky, and are based solely on educated

22 guesses as to a person's likely date of death; (ii) if the viator lives longer than expected, not only

23 would the CCBS Plan not get "guaranteed" "double-digit" returns, but it could lose a significant

24 amount of money; (iii) VCI was already under heavy regulatory scrutiny, and far from being a

25 reputable company, had already been the subject of several, public cease-and-desist orders; (iv) VCI

26 had used an unlicensed viatical settlement broker to procure a number of its policies, and was forced

27 to discontinue that relationship in 1999; (v) VCI was purchasing a number of rescindable policies –

28 thereby increasing the risk; (vi) the LLCs did not actually own many of the viatical settlements, and

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    10

CCBS Plan v. Dawson
Case No. _____

1   (vii) losses from the investment would not be covered by insurance.

2         47.    The information listed above was publicly available through readily-accessible means.

3   For example, on January 5, 1999, the State of Washington Department of Financial Institutions,

4   Securities Division, entered a statement of charges against VCI, including that VCI was violating

5   state anti-fraud provisions in its sale of viatical settlements because it failed to inform investors of the

6   material facts of the investment, such as risks of the offering, sales commissions, business history, and

7   financial condition of VCI.  In May 2001 – two months prior to the CCBS Plan's investment – the

8   court overseeing the charges issued its preliminary findings of fact and law and issued a preliminary

9   cease and desist order.

10         48.    Moreover, a *yahoo!* internet search using the term "Viatical Capital, Inc." yielded this

11   as the first response:  http://www.viatical-expert.net/summary/Other_cos/viatical_capital.htm.  The

12   website listed Viatical Capital, Inc. as being on the "hotseat" and had this to note: "Investors Beware:

13   The companies market *contestable* policies and may attempt to sell them to you.  The above is OLD

14   news posted on this Website long before any enforcement actions were taken.  Since then, several

15   states issued cease and desist orders against these entities (e.g., Indiana, Ohio, Washington,

16   Wisconsin)."

17         49.    The viatical-expert.net website cited above has existed since before August 2001 and

18   generally provides information to investors on the risks of viatical settlements.  Other publicly

19   available information exists as to the risks inherent in investing in viatical settlements.

20         50.    In addition, any due diligence inspection of VCI would have revealed that the

21   company was not structured the way that Dawson claimed it was, including that the LLCs were not

22   the beneficial owner of the policies, the LLCs were investing in voidable policies, York and Coyne

23   (and not the investors) made all significant management decisions, and the investments were not

24   insured.  Dawson's failure to learn these facts is indicative that he did not perform *any* due diligence,

25   let alone the satisfactory and reasonable due diligence that he led the CCBS Plan to believe he had

26   performed.

27         51.    Dawson's lack of proper due diligence is particularly reckless an/or intentional,

28   because he was specifically on notice that there were problems in the viatical settlement industry

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

11

CCBS Plan v. Dawson
Case No. _____

1  generally.  As he told Dr. Kaczmar, "you may have heard about problems with these investments in

2  the past," yet he did not perform the basic research needed to confirm whether the proposed

3  investment was risky and/or was plagued by the same problems that were rampant in the industry

4  generally.

5  52.  Given the above, it is clear that Dawson was not interested in learning the truth about

6  the investment he was pushing on the CCBS Plan but rather was interested only in earning his

7  commission fee.  Given the ease with which this information could have been learned, Dawson either

8  knew this information and ignored it or made a conscious, deliberate decision to recklessly promote

9  this investment without researching VCI and the wealth of public, adverse information  known about

10  VCI.

11  **D.     Damages**

12  53.  The CCBS Plan has been damaged by Dawson's conduct.  In September 2003, the

13  SEC instituted a civil action against VCI, York, and Coyne for securities laws violations, and as part

14  of that lawsuit, the Court issued an order freezing VCI's assets.  Testimony in that lawsuit has

15  revealed that VCI's actual assets are significantly below their stated assets.  As such, the CCBS

16  Plan's investment of $665,000 in LLC-IG-2 is worth considerably less, although the precise amount

17  of the CCBS Plan' damage caused by Dawson's fraudulent acts cannot be determined until trial.

18  

**FIRST CAUSE OF ACTION**
**Sale of Unregistered Security**
19  **(15 U.S.C. § 77l(a)(1))**

20  54.  Plaintiff sets forth by reference as though fully set forth below each and every

21  allegation of paragraphs 1-53 of this Complaint.

22  55.  On or about August 10, 2001, VCI offered and sold to the CCBS Plan a total of 133

23  membership units of Life Investment Funding Enterprise  LLC-IG-2 at the price of $5,000 per unit,

24  for a total of $665,000.  VCI, and LLC-IG-2 ( the LLC set up by VCI) were the issuers in an issuer

25  transaction.

26  56.  This transaction was effectuated using the United States mail and other

27  instrumentalities of interstate commerce, insofar as the CCBS Plan was required to mail a signed copy

28  of the Operating Agreement to VCI and VCI mailed to the CCBS Plan a statement confirming the

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

12

CCBS Plan v. Dawson
Case No. _____

1   investment.

2        57.    Dawson, in his role as compensated agent for VCI and as financial advisor for the

3   CCBS Plan, solicited and facilitated the CCBS Plan's investment in LLC-IG-2.  In so doing, Dawson

4   acted for his own financial gain, insofar as he received compensation from the CCBS Plan with

5   respect to this investment.

6        58.    The CCBS Plan's investment in LLC-IG-2 constitutes a "security" as that term is

7   defined by the federal securities laws and related caselaw, insofar as the investment constitutes an

8   investment of money in a common enterprise with profits to come solely from the efforts of others.

9   This sale constituted an issuer transaction in that it was part of an initial offering of a membership

10  interest by LLC-IG-2.  Nonetheless, at the time of the CCBS Plan's investment the sale was subject

11  to the registration requirements of 15 U.S.C. § 77e, was not exempt from registration, and was not

12  registered as any kind of securities transaction.

13       59.    As a result of the above-described acts, Dawson is liable to the CCBS Plan, who is

14  entitled to, and hereby does, rescind the above-described purchase.  Before entry of judgment, the

15  CCBS Plan will tender to Dawson the 133 membership units in LLC-IG-2.  To date, the CCBS Plan

16  has received as total income from its investment in LLC-IG-2 an amount to be proven at trial.

17       60.    Defendant Dawson knew that the transaction was subject to the registration

18  requirements, was not exempt from registration, and was not registered.  Nonetheless, Dawson

19  fraudulently told the CCBS Plan that the transaction was not subject to the registration requirement

20  when he passed along literature to the CCBS Plan falsely informing the CCBS Plan that the CCBS

21  Plan would be taking an active management role of the LLC-IG-2 investment.  If Dawson's

22  representation had been true, then the transaction would have been exempt from the registration

23  requirements.  The CCBS Plan did not learn about the falseness of this representation until September

24  2003.

25       61.    WHEREFORE, Plaintiff requests relief as hereafter provided.

26  / / /

27  / / /

28

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES          13          CCBS Plan v. Dawson
Case No. _____

## SECOND CAUSE OF ACTION
### Material Misrepresentation / Omission in Prospectus
### (15 U.S.C. § 77l(a)(2))

62.     Plaintiff sets forth by reference as though fully set forth below each and every allegation of paragraphs 1-61 of this Complaint.

63.     On or about August 10, 2001, VCI offered and sold to the CCBS Plan a total of 133 membership units of Life Investment Funding Enterprise LLC-IG-2 at the price of $5,000 per unit, for a total of $665,000.  VCI and LLC-IG-2 ( the LLC set up by VCI) were the issuers in an issuer transaction.

64.     This transaction was effectuated using the United States mail and other instrumentalities of interstate commerce, insofar as the CCBS Plan was required to mail a signed copy of the Operating Agreement to VCI and VCI mailed to the CCBS Plan a statement confirming the investment.

65.     Dawson, in his role as compensated agent for VCI and as financial advisor for the CCBS Plan, solicited and facilitated the CCBS Plan's investment in LLC-IG-2.  In so doing, Dawson acted for his own financial gain, insofar as he received compensation from the CCBS Plan with respect to this investment.

66.     The CCBS Plan's investment in LLC-IG-2 constitutes a "security" as that term is defined by the federal securities laws and related caselaw, insofar as the investment constitutes an investment of money in a common enterprise with profits to come solely from the efforts of others.

67.     Dawson solicited the CCBS Plan's investment through the means of a written prospectus and related oral comments, namely the document entitled "Improving the Quality of Life."

68.     The prospectus contained untrue statements of material fact, including that (i) the investment was of a "stable nature," (ii) VCI relied on the "safety of the insurance industry ratings," (iii) "there can be no default on payment of policies, only delay", and (iv) VCI would "utilize the industry's stringent security criteria procedures in place provided by medical utilization review companies, Triage physician board review, insurance carriers, due diligence, and others."

69.     These statements were false, including because (i) the investment was inherently risky and not stable, (ii) VCI used unlicensed viatical settlement providers to procure their policies,

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    14

CCBS Plan v. Dawson
Case No. _____

1   (iii) VCI was a fly-by-night company, and (iv) VCI purchased rescindable policies, for which payment

2   was not guaranteed,

3        70.    Dawson knew these statement were false and/or in the exercise of reasonable care, he

4   should have known of the untruth of these statements.

5        71.    The value of the CCBS Plan's investment in LLC-IG-2 has significantly decreased

6   since August 2001, and such decrease resulted from the false statements in the prospectus identified

7   above.

8        72.    As a result of the above-described acts, Dawson is liable to the CCBS Plan, who is

9   entitled to, and hereby does, rescind the above-described purchase.  Before entry of judgment, the

10  CCBS Plan will tender to Dawson the 133 membership units in LLC-IG-2.  To date, the CCBS Plan

11  has received as total income from its investment in LLC-IG-2 an amount to be proven at trial.

12       73.    The CCBS Plan did not learn about the falsity of the above statements until September

13  2003, when the Securities and Exchange Commission filed suit against VCI, York, and Coyne, and

14  the true nature of the CCBS Plan's investment in LLC-IG-2 was revealed.

15       74.    WHEREFORE, Plaintiff requests relief as hereafter provided.

16  **THIRD CAUSE OF ACTION**
    **Securities Fraud in Violation of Rule 10b(5)**

17  **(15 U.S.C. § 78j and Rule 10b-(5) Promulgated Thereunder)**

18       75.    Plaintiff sets forth by reference as though fully set forth below each and every

19  allegation of paragraphs 1-74 of this Complaint.

20       76.    On or about August 10, 2001, VCI offered and sold to the CCBS Plan a total of 133

21  membership units of Life Investment Funding Enterprise  LLC-IG-2 at the price of $5,000 per unit,

22  for a total of $665,000.  VCI and LLC-IG-2 ( the LLC set up by VCI) were the issuers in an issuer

23  transaction.

24       77.    This transaction was effectuated using the United States mail and other

25  instrumentalities of interstate commerce, insofar as the CCBS Plan was required to mail a signed copy

26  of the Operating Agreement to VCI and VCI mailed to the CCBS Plan a statement confirming the

27  investment.

28       78.    Dawson, in his role as compensated agent for VCI and as financial advisor for the

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES     15     CCBS Plan v. Dawson
Case No. _____

1   CCBS Plan, solicited and facilitated the CCBS Plan's investment in LLC-IG-2. In so doing, Dawson

2   acted for his own financial gain, insofar as he received compensation from the CCBS Plan with

3   respect to this investment.

4      79. The CCBS Plan's investment in LLC-IG-2 constitutes a "security" as that term is

5   defined by the federal securities laws and related caselaw, insofar as the investment constitutes an

6   investment of money in a common enterprise with profits to come solely from the efforts of others.

7      80. From approximately April through August 2001, in connection with the sale of the

8   investment in the VCI-sponsored investment vehicle, Dawson made the oral and written

9   representations to the CCBS Plan during various face-to-face meetings with the CCBS Plan personnel

10  identified in paragraphs 27-43, *supra,* including that (i) an investment in a VCI-sponsored LLC would

11  yield an approximately 18% return, and if the viator failed to die within the prescribed time frame, the

12  CCBS Plan could sell the insurance policies back to VCI for only a nominal drop in the rate of return;

13  (ii) double-digit returns were "guaranteed" and there could be "no default on payment of policies,

14  only delay"; (iii) the VCI investment was "extremely safe" and VCI investors "don't lose"; (iv) VCI

15  carefully screened potential policies prior to purchase, and made their purchases based on

16  "undisputed medical facts"; (v) the VCI investment would be fully insured through a bonding

17  program; (vi) the LLC would be the actual owner of the viatical policies at issue; (vii) VCI was not a

18  "fly-by-night" operation; (viii) Dawson had performed adequate due diligence into the investment

19  prior to recommending it to the CCBS Plan; (ix) LLC members would actually manage the

20  investment; and (x) the investment was suitable for the CCBS Plan, given its stated investment goals.

21     81. The representations made by Dawson were false and were material to this transaction.

22  The true facts are set forth in paragraphs 27-43, *supra.*

23     82. When Dawson made these representations, he knew them to be false and/or acted with

24  reckless disregard as to the truth or falsity of the statements, as stated in paragraphs 44-52, *supra.*

25  Dawson made these representations with the intention to deceive and defraud the CCBS Plan and to

26  induced the CCBS Plan to act in reliance on these representations in the manner hereafter alleged, or

27  with the expectation that the CCBS Plan would so act.

28     83. In addition, the oral and written statements made by Dawson omitted to state material

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES   16   CCBS Plan v. Dawson
Case No. _____

facts necessary in order to make the statements made in those communications, in the light of the circumstances under which they were made, not misleading, as set forth in paragraphs 27-43, *supra*, including by failing to inform the CCBS Plan that (i) many of the investments in the LLC were rescindable insurance policies; (ii) RFG, and not the LLC, was the beneficial owner of many of the viatical settlements; (iii) prior to the CCBS Plan's investment, several states had already issued cease-and-desist orders against VCI; (iv) most of the CCBS Plan's investments were not covered by insurance policies; (v) much of the return-on-investment information was generated by VCI through a ponzi-like scheme; and (vi) VCI had a standard twenty percent administrative fee.

84.     The omissions of material facts were necessary in order to make the statements made in those communications, in the light of the circumstances under which they were made, not misleading, for the reasons given in paragraphs 27-43, *supra*.  For the reasons stated in paragraphs 44-52, *supra*, Dawson either knew that he omitted the material facts or acted with reckless disregard as to whether those facts must be disclosed in order to make his communications, in the light of the circumstances under which they were made, not misleading.

85.     The representations and failures to disclose information and suppressions of information herein alleged to have been made by Dawson were made with the intent to induce the CCBS Plan to act in the manner herein alleged in reliance thereon.  The CCBS Plan, at the time the representations were made by Dawson, at the time the failures to disclose and suppressions of facts occurred, and at the time the CCBS Plan took the actions herein alleged, was ignorant of the falsity of Dawson's representations and ignorant of the existence of the facts which Dawson suppressed and failed to disclose.

86.     In reliance on these representations and without knowledge of the suppressed facts, the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson. Had the CCBS Plan known the actual facts, it would not have taken such action.  The CCBS Plan's reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the CCBS Plan with respect to this transaction.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES     17     CCBS Plan v. Dawson
Case No. _____

87.     As a proximate result of the fraudulent conduct herein alleged, the CCBS Plan was induced to purchase 133 membership units in LLC-IG-2, at $5,000 per unit. VCI's actual assets are significantly below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-IG-2 is worth considerably less. The precise amount of the CCBS Plan' damage caused by Dawson's fraudulent acts will be determined at trial.

88.     The aforementioned conduct of Dawson was an intentional misrepresentation, deceit, or concealment of a material fact known to Dawson with the intention on the part of Dawson of thereby depriving the CCBS Plan of property or legal rights or otherwise causing injury, and was despicable conduct, so as to justify an award of exemplary and punitive damages.

89.     WHEREFORE, Plaintiff requests relief as hereafter provided.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty by ERISA Fiduciary**
**(29 U.S.C. §§ 1104, 1109)**

90.     Plaintiff sets forth by reference as though fully set forth below each and every allegation of paragraphs 1-89 of this Complaint.

91.     At all times relevant hereto, the CCBS Plan was an ERISA-qualified plan known as the Money Purchase Pension Plan. As of August 2001, the CCBS Plan had approximately $3.2 million worth of assets. At that time, the CCBS Plan held the majority of its pension funds in SEI Investments (a family of mutual funds and individual stocks).   It was Dawson, in his role as a broker for SEI Investments and financial advisor to the CCBS Plan, who convinced the CCBS Plan to make the investment and facilitated the investment. Dawson received a monetary commission for brokering this transaction.

92.     From the time that the CCBS Plan made its investment in SEI, Dawson was active in monitoring the CCBS Plan's SEI portfolio. In late 2000, Dawson became concerned that the CCBS Plan's investment in SEI was performing poorly, and from January through August 2001, Dawson – in his role as the CCBS Plan's financial advisor – had three meetings with the CCBS Plan's pension fund trustees to rectify that issue. As a result, on or about August 10, 2001, the CCBS Plan, at the recommendation of Dawson, invested $665,000 of the Money Purchase Pension Plan funds by purchasing a total of 133 membership units of Life Investment Funding Enterprise LLC-IG-2 at the

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                                    18                          CCBS Plan v. Dawson
Case No. _____

1    price of $5,000 per unit.

2        93.    Dawson was a fiduciary with respect to the CCBS Plan.  He made recommendations

3    as to the advisability of investing in, purchasing or selling securities (including the LLC-IG-2

4    investment), and (i) he rendered such advice for compensation, on a regular basis, pursuant to a

5    mutual agreement and/or arrangement of understanding between himself and the Plan trustees, (ii) his

6    advice served as the primary basis for the investment decisions with respect to plan assets, and (iii) he

7    rendered individualized investment advice to the CCBS Plan based on the particular needs of the

8    CCBS Plan.

9        94.    As a fiduciary to the CCBS Plan's pension plan, Dawson owed a fiduciary duty to the

10   plan.  He breached these fiduciary duties because (i) he did not act solely in the interest of the

11   participants and beneficiaries of the plan, for the exclusive purpose of providing benefits to the plan

12   participants and beneficiaries; (ii) he failed to act with the care, skill, prudence, and diligence under

13   the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

14   matters would use in recommending an investment to a pension plan; and (iii) he did not act in

15   accordance with the documents and instruments governing the plan, insofar as he recommended a

16   significantly risky investment to the plan.

17       95.    In particular, in recommending to the CCBS Plan that it invest in LLC-IG-2, Dawson

18   made a substantial number of material misstatements and omitted to state several material facts, as

19   detailed *supra* at paragraphs 27-43.  The true facts are detailed *supra* at paragraphs 27-43.  For the

20   reasons stated in paragraphs 44-52, *supra*, Dawson either knew that his representations were false

21   and that he omitted the material facts or acted with reckless disregard as to the truth or falsity of his

22   statements and whether those facts must be disclosed in order to make his communications, in the

23   light of the circumstances under which they were made, not misleading.

24       96.    In an effort to ease the CCBS Plan's concerns over their investment in VCI, thereby

25   earning a commission on the transaction, Dawson informed the CCBS Plan that he had conducted

26   "due diligence" into the background of VCI and there was no cause for concern.  That statement was

27   deliberately false.  In fact, Dawson conducted no (or very little) due diligence into the background of

28   VCI and little to no research on viatical settlements in general.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    19                    CCBS Plan v. Dawson
Case No. _____

97.     In making the statements listed above, and in omitting to state material facts as listed above, Dawson acted with the intent to induce the CCBS Plan to act in the manner herein alleged in reliance thereon.

98.     In reliance on these representations and without knowledge of the suppressed facts, the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson. Had the CCBS Plan known the actual facts, it would not have taken such action.  The CCBS Plan's reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the CCBS Plan with respect to this transaction.

99.     As a proximate result of the fraudulent conduct herein alleged, the CCBS Plan was induced to purchase 133 membership units in LLC-IG-2, at $5,000 per unit.  VCI's actual assets are significantly below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-IG-2 is worth considerably less.  The precise amount of the CCBS Plan' damage caused by Dawson's fraudulent acts will be determined at trial.

100.     WHEREFORE, Plaintiff requests relief as hereafter provided.

### FIFTH CAUSE OF ACTION
### Material Misrepresentation in Securities Transaction
### (Cal. Corp. Code Sections 25501, 25504)

101.     Plaintiff sets forth by reference as though fully set forth below each and every allegation of paragraphs 1-100 of this Complaint.

102.     At all times relevant hereto, the CCBS Plan had an ERISA-qualified plan known as the Money Purchase Pension Plan.  As of August 2001, the Pension Plan had approximately $3.2 million worth of assets.

103.     On or about August 10, 2001, VCI, in California, offered and sold to the CCBS Plan a total of 133 membership units of Life Investment Funding Enterprise  LLC-IG-2 at the price of $5,000 per unit, for a total of $665,000.  The membership interests in LLC-IG-2 constituted a "security" as that term is defined by the California Corporations Code, and Dawson is a "broker-dealer" as that term is defined by the California Corporations Code.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                     20                     CCBS Plan v. Dawson
Case No. _____

104.     That transaction was made by means of oral and written communications, including various statements by Dawson (VCI's agent) and an advertising pamphlet and Operating Agreement. Those oral statements, written pamphlet, and Operating Agreement contained untrue statement of material facts, including that (i) an investment in a VCI-sponsored LLC would yield an approximately 18% return, and if the viator failed to die within the prescribed time frame, the CCBS Plan could sell the insurance policies back to VCI for only a nominal drop in the rate of return; (ii) double-digit returns were "guaranteed" and there could be "no default on payment of policies, only delay"; (iii) the VCI investment was "extremely safe" and VCI investors "don't lose"; (iv) VCI carefully screened potential policies prior to purchase, and made their purchases based on "undisputed medical facts"; (v) the VCI investment would be fully insured through a bonding program; (vi) the LLC would be the actual owner of the viatical policies at issue; (vii) VCI was not a "fly-by-night" operation; (viii) Dawson had performed adequate due diligence into the investment prior to recommending it to the CCBS Plan; (ix) LLC members would actually manage the investment; and (x) the investment was suitable for the CCBS Plan, given its stated investment goals.

105.     The representations made by Dawson and in the written materials were false and were material to this transaction. The true facts are set forth in paragraphs 27-43, *supra*. When Dawson made these representations, he knew them to be false and/or acted with reckless disregard as to the truth or falsity of the statements, as stated in paragraphs 44-52, *supra*.

106.     In addition, the oral statements, written pamphlet, and Operating Agreement omitted to state material facts necessary in order to make the statements made in those communications, in the light of the circumstances under which they were made, not misleading, including by failing to inform the CCBS Plan that (i) many of the investments in the LLC were rescindable insurance policies; (ii) RFG, and not the LLC, was the beneficial owner of many of the viatical settlements; (iii) prior to the CCBS Plan's investment, several states had already issued cease-and-desist orders against VCI; (iv) most of the CCBS Plan's investments were not covered by insurance policies; (v) much of the return-on-investment information was generated by VCI through a ponzi-like scheme; (vi) VCI had a standard twenty percent administrative fee.

107.     The omissions of material facts were necessary in order to make the statements made

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                    21                    CCBS Plan v. Dawson
Case No. _____

in those communications, in the light of the circumstances under which they were made, not misleading, for the reasons given in paragraphs 27-43, *supra*.  For the reasons stated in paragraphs 44-52, *supra*, Dawson either knew that he omitted the material facts or acted with reckless disregard as to whether those facts must be disclosed in order to make his communications, in the light of the circumstances under which they were made, not misleading.

108.    Defendant Dawson was, at the time of the acts alleged herein, a broker-dealer who materially aided in the transaction constituting the violation complained of, in that he made most of the material misstatements, omitted most of the material facts, listed in paragraphs 27-43 and 104-08 of this Complaint, in order to entice the CCBS Plan to make the above-described purchase.

109.    Given the previous cease-and-desist orders against VCI and the negative publicity surrounding viatical settlements in general, and VCI in particular, Dawson had knowledge of or reasonable grounds to believe that his statements were false and that he omitted material facts, as stated in paragraphs 27-43 and 104-07 of this Complaint.

110.    As a result of the material misrepresentations and omissions, Plaintiff is entitled to rescind the above-described purchase.

111.    Before entry of judgment, Plaintiff will tender to Defendant the 133 membership units in LLC-IG-2, as purchased from VCI, and on which to date Plaintiff has received as total income an amount to be proven at trial.

112.    As a result of Defendant's material misrepresentations and omissions as alleged in paragraphs 27-43 and 104-07 of this Complaint, Defendant is liable to Plaintiff, who is entitled, in lieu of rescission, to sue for damages as a result of the decreased value of Plaintiff's investment in LLC-IG-2.  The investment has decreased in value in an amount to be proven at trial.

113.    WHEREFORE, Plaintiff requests relief as hereafter provided.

/ / /

/ / /

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

22

CCBS Plan v. Dawson
Case No. _____

**SIXTH CAUSE OF ACTION**
**Sale of Securities in Violation of Qualification Requirements**
**(Cal. Corp. Code Sections 25503, 25504)**

114.   Plaintiff sets forth by reference as though fully set forth below each and every allegation of paragraphs 1-113 of this Complaint.

115.   On or about August 10, 2001, VCI in California, offered and sold to the CCBS Plan a total of 133 membership units of Life Investment Funding Enterprise  LLC-IG-2 at the price of $5,000 per unit, for a total of $665,000.  VCI, and LLC-IG-2 ( the LLC set up by VCI) were the issuers in an issuer transaction.  The membership interests in LLC-IG-2 constituted a "security" as that term is defined by the California Corporations Code, and Dawson is a "broker-dealer" as that term is defined by the California Corporations Code.

116.   This sale constituted an issuer transaction in that it was part of an initial offering of a membership interest by LLC-IG-2.  Nonetheless, at the time of the CCBS Plan's investment, the sale was subject to qualification, was not exempt from qualification, and was not qualified as any kind of securities transaction with the Commissioner of Corporations.

117.   Defendant Dawson was, at the time of the acts alleged herein, a broker-dealer who materially aided in the transaction constituting the violation complained of in this cause of action, in that in his role as a broker-dealer, he solicited the CCBS Plan to invest in LLC-IG-2, even though that transaction was subject to the qualification requirements, was not exempt from qualification, and was not qualified.

118.   Defendant Dawson knew that the transaction was subject to the qualification requirements, was not exempt from qualification, and was not qualified.  Nonetheless, Dawson constructively told the CCBS Plan that the transaction was not subject to the qualification requirement when he passed along literature to the CCBS Plan falsely informing the CCBS Plan that it would be taking an active management role of the LLC-IG-2 investment.  Plaintiff did not learn about the falseness of this representation until September 2003.

119.   As a result of the above-described acts, VCI and Dawson are liable to Plaintiff, who is entitled to, and hereby does, rescind the above-described purchase.  Before entry of judgment, Plaintiff will tender to Defendant the 133 membership units in LLC-IG-2, as purchased from VCI,

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

23

CCBS Plan v. Dawson
Case No. _____

1  and on which to date Plaintiff has received as total income an amount to be proven at trial.

2      120.   WHEREFORE, Plaintiff requests relief as hereafter provided.

3                        **SEVENTH CAUSE OF ACTION**
   **Fraud and Deceit: Intentional Misrepresentation/Concealment of Fact**
4                  **(California Civil Code §§ 1709, 1710)**

5      121.   Plaintiff sets forth by reference as though fully set forth below each and every

6  allegation of paragraphs 1-120 of this Complaint.

7      122.   At all times mentioned herein, Dawson was the financial advisor for the CCBS Plan

8  and was the broker who effectuated the CCBS Plan's purchase of 133 membership interests in the

9  VCI-sponsored investment vehicle known as LLC-IG-2.  As the financial advisor and broker to the

10 CCBS Plan, Dawson owed a fiduciary duty to the CCBS Plan.

11     123.   From approximately April through August 2001, Dawson made the following oral and

12 written representations to the CCBS Plan during various face-to-face meetings with the CCBS Plan

13 personnel: that (i) an investment in a VCI-sponsored LLC would yield an approximately 18% return,

14 and if the viator failed to die within the prescribed time frame, the CCBS Plan could sell the insurance

15 policies back to VCI for only a nominal drop in the rate of return; (ii) double-digit returns were

16 "guaranteed" and there could be "no default on payment of policies, only delay"; (iii) the VCI

17 investment was "extremely safe" and VCI investors "don't lose"; (iv) VCI carefully screened potential

18 policies prior to purchase, and made their purchases based on "undisputed medical facts"; (v) the VCI

19 investment would be fully insured through a bonding program; (vi) the LLC would be the actual

20 owner of the viatical policies at issue; (vii) VCI was not a "fly-by-night" operation; (viii) Dawson had

21 performed adequate due diligence into the investment prior to recommending it to the CCBS Plan;

22 (ix) LLC members would actually manage the investment; and (x) the investment was suitable for the

23 CCBS Plan, given its stated investment goals.

24     124.   The representations made by Dawson were false.  The true facts are set forth in

25 paragraphs 27-43, *supra*.

26     125.   When Dawson made these representations, he knew them to be false and/or acted with

27 reckless disregard as to the truth or falsity of the statements, as stated in paragraphs 44-52, *supra*.

28 He made these representations with the intention to deceive and defraud the CCBS Plan and to

Kennedy, Archer & Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES          24          CCBS Plan v. Dawson
Case No. _____

1   induced the CCBS Plan to act in reliance on these representations in the manner hereafter alleged, or

2   with the expectation that the CCBS Plan would so act.

3       126.   In addition, the oral and written statements made by Dawson omitted to state material

4   facts necessary in order to make the statements made in those communications, in the light of the

5   circumstances under which they were made, not misleading, including by failing to inform the CCBS

6   Plan that (i) many of the investments in the LLC were rescindable insurance policies; (ii) RFG, and

7   not the LLC, was the beneficial owner of many of the viatical settlements; (iii) prior to the CCBS

8   Plan's investment, several states had already issued cease-and-desist orders against VCI; (iv) most of

9   the CCBS Plan's investments were not covered by insurance policies; (v) much of the return-on-

10  investment information was generated by VCI through a ponzi-like scheme; and (vi) VCI had a

11  standard twenty percent administrative fee.

12      127.   The omissions of material facts were necessary in order to make the statements made

13  in those communications, in the light of the circumstances under which they were made, not

14  misleading, for the reasons given in paragraphs 27-43, *supra*.  For the reasons stated in paragraphs

15  44-52, *supra*, Dawson either knew that he omitted the material facts or acted with reckless disregard

16  as to whether those facts must be disclosed in order to make his communications, in the light of the

17  circumstances under which they were made, not misleading.

18      128.   The representations and failures to disclose information and suppressions of

19  information herein alleged to have been made by Dawson were made with the intent to induce the

20  CCBS Plan to act in the manner herein alleged in reliance thereon.  The CCBS Plan, at the time the

21  representations were made by Dawson, at the time the failures to disclose and suppressions of facts

22  occurred, and at the time the CCBS Plan took the actions herein alleged, was ignorant of the falsity of

23  Dawson's representations and ignorant of the existence of the facts which Dawson suppressed and

24  failed to disclose.

25      129.   In reliance on these representations and without knowledge of the suppressed facts,

26  the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the

27  VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson.

28  Had the CCBS Plan known the actual facts, it would not have taken such action.  The CCBS Plan's

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

CCBS Plan v. Dawson
Case No. _____

reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's

financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the

CCBS Plan with respect to this transaction.

130.    As a proximate result of the fraudulent conduct herein alleged, the CCBS Plan was

induced to purchase 133 membership units in LLC-IG-2, at $5,000 per unit.  VCI's actual assets are

significantly below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-

IG-2 is worth considerably less.  The precise amount of the Plaintiff's damage caused by Dawson's

fraudulent acts will be determined at trial.

131.    The aforementioned conduct of Dawson was an intentional misrepresentation, deceit,

or concealment of a material fact known to Dawson with the intention on the part of Dawson of

thereby depriving the CCBS Plan of property or legal rights or otherwise causing injury, and was

despicable conduct, so as to justify an award of exemplary and punitive damages.

132.    WHEREFORE, Plaintiff requests relief as hereafter provided.

## EIGHTH CAUSE OF ACTION
### Fraud and Deceit: Negligent Misrepresentation/Concealment of Fact
### (California Civil Code § 1710)

133.    Plaintiff sets forth by reference as though fully set forth below each and every

allegation of paragraphs 1-132 of this Complaint.

134.    At all times mentioned herein, Dawson was the financial advisor for the CCBS Plan

and was the broker who effectuated the CCBS Plan's purchase of 133 membership interests in the

VCI-sponsored investment vehicle known as LLC-IG-2.  As the financial advisor and broker to the

CCBS Plan, Dawson owed a fiduciary duty to the CCBS Plan.

135.    From approximately April through August 2001, Dawson made the following oral and

written representations to the CCBS Plan during various face-to-face meetings with the CCBS Plan

personnel: that (i) an investment in a VCI-sponsored LLC would yield an approximately 18% return,

and if the viator failed to die within the prescribed time frame, the CCBS Plan could sell the insurance

policies back to VCI for only a nominal drop in the rate of return; (ii) double-digit returns were

"guaranteed" and there could be "no default on payment of policies, only delay"; (iii) the VCI

investment was "extremely safe" and VCI investors "don't lose"; (iv) VCI carefully screened potential

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                26                CCBS Plan v. Dawson
Case No. _____

1   policies prior to purchase, and made their purchases based on "undisputed medical facts"; (v) the VCI

2   investment would be fully insured through a bonding program; (vi) the LLC would be the actual

3   owner of the viatical policies at issue; (vii) VCI was not a "fly-by-night" operation; (viii) Dawson had

4   performed adequate due diligence into the investment prior to recommending it to the CCBS Plan;

5   (ix) LLC members would actually manage the investment; and (x) the investment was suitable for the

6   CCBS Plan, given its stated investment goals.

7        136.   The representations made by Dawson were false.  The true facts are set forth in

8   paragraphs 27-43, *supra*.

9        137.   In addition, the oral and written statements made by Dawson omitted to state material

10  facts necessary in order to make the statements made in those communications, in the light of the

11  circumstances under which they were made, not misleading, including by failing to inform the CCBS

12  Plan that (i) many of the investments in the LLC were rescindable insurance policies; (ii) RFG, and

13  not the LLC, was the beneficial owner of many of the viatical settlements; (iii) prior to the CCBS

14  Plan's investment, several states had already issued cease-and-desist orders against VCI; (iv) most of

15  the CCBS Plan's investments were not covered by insurance policies; (v) much of the return-on-

16  investment information was generated by VCI through a ponzi-like scheme; and (vi) VCI had a

17  standard twenty percent administrative fee.

18       138.   The omissions of material facts were necessary in order to make the statements made

19  in those communications, in the light of the circumstances under which they were made, not

20  misleading, for the reasons given in paragraphs 27-43, *supra*.

21       139.   Dawson had no reasonable grounds for believing that his statements were true and he

22  knew that he had omitted material facts that were necessary to make his affirmative statements, in the

23  light of the circumstances in which they were made, not misleading.  In particular, for the reasons

24  stated in paragraphs 44-52, *supra*, Dawson was on notice that viatical settlements were risky

25  investments and significant information was available to Dawson that would have informed him that

26  viatical settlements were risky investments and that VCI itself was a troubled company that the CCBS

27  Plan should not invest in, yet Dawson did not perform any research or due diligence prior to

28  recommending the VCI investment to the CCBS Plan or "guaranteeing" "double-digit" returns.

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                               27                          CCBS Plan v. Dawson
Case No. _____

140.    Dawson made these representations and or omissions of material fact with the intention of inducing the CCBS Plan to act in reliance thereon in the manner hereafter alleged, or with the expectation that the CCBS Plan would so act.

141.    The CCBS Plan, at the time the representations were made by Dawson, at the time the failures to disclose and suppressions of facts occurred, and at the time the CCBS Plan took the actions herein alleged, was ignorant of the falsity of Dawson's representations and ignorant of the existence of the facts which Dawson suppressed and failed to disclose.

142.    In reliance on these representations and without knowledge of the suppressed facts, the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson. Had the CCBS Plan known the actual facts, it would not have taken such action.

143.    The CCBS Plan's reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the CCBS Plan with respect to this transaction.

144.    As a proximate result of the fraudulent conduct herein alleged, the CCBS Plan was induced to purchase 133 membership units in LLC-IG-2, at $5,000 per unit.  VCI's actual assets are significantly below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-IG-2 is worth considerably less.  The precise amount of the CCBS Plan' damage caused by Dawson's fraudulent acts will be determined at trial.

145.    WHEREFORE, Plaintiff requests relief as hereafter provided.

**NINTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

146.    Plaintiff sets forth by reference as though fully set forth below each and every allegation of paragraphs 1-145 of this Complaint.

147.    Dawson was the financial advisor to the CCBS Plan, and as such owed a fiduciary duty to the plan.  In recommending, soliciting, and effectuating the CCBS Plan's purchase of 133 membership units in LLC-IG-2, for a total cost of $665,000, Dawson breached that fiduciary duty.

148.    In particular, in recommending to the CCBS Plan that it invest in LLC-IG-2, Dawson

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

28

CCBS Plan v. Dawson
Case No. _____

1  made a substantial number of material misstatements and omitted to state several material facts, as

2  follows.

3        149.    From approximately April through August 2001, Dawson made the following oral and

4  written representations to the CCBS Plan during various face-to-face meetings with the CCBS Plan

5  personnel: that (i) an investment in a VCI-sponsored LLC would yield an approximately 18% return,

6  and if the viator failed to die within the prescribed time frame, the CCBS Plan could sell the insurance

7  policies back to VCI for only a nominal drop in the rate of return; (ii) double-digit returns were

8  "guaranteed" and there could be "no default on payment of policies, only delay"; (iii) the VCI

9  investment was "extremely safe" and VCI investors "don't lose"; (iv) VCI carefully screened potential

10  policies prior to purchase, and made their purchases based on "undisputed medical facts"; (v) the VCI

11  investment would be fully insured through a bonding program; (vi) the LLC would be the actual

12  owner of the viatical policies at issue; (vii) VCI was not a "fly-by-night" operation; (viii) Dawson had

13  performed adequate due diligence into the investment prior to recommending it to the CCBS Plan;

14  (ix) LLC members would actually manage the investment; and (x) the investment was suitable for the

15  CCBS Plan, given its stated investment goals.

16        150.    The representations made by Dawson were false. The true facts are set forth in

17  paragraphs 27-43, *supra*.

18        151.    When Dawson made these representations, he knew them to be false and/or acted with

19  reckless disregard as to the truth or falsity of the statements, as stated in paragraphs 44-52, *supra*.

20  He made these representations with the intention to deceive and defraud the CCBS Plan and to

21  induced the CCBS Plan to act in reliance on these representations in the manner hereafter alleged, or

22  with the expectation that the CCBS Plan would so act.

23        152.    In addition, the oral and written statements made by Dawson omitted to state material

24  facts necessary in order to make the statements made in those communications, in the light of the

25  circumstances under which they were made, not misleading, including by failing to inform the CCBS

26  Plan that (i) many of the investments in the LLC were rescindable insurance policies; (ii) RFG, and

27  not the LLC, was the beneficial owner of many of the viatical settlements; (iii) prior to the CCBS

28  Plan's investment, several states had already issued cease-and-desist orders against VCI; (iv) most of

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES

29

CCBS Plan v. Dawson
Case No. _____

1  the CCBS Plan's investments were not covered by insurance policies; (v) much of the return-on-

2  investment information was generated by VCI through a ponzi-like scheme; and (vi) VCI had a

3  standard twenty percent administrative fee.

4        153.    The omissions of material facts were necessary in order to make the statements made

5  in those communications, in the light of the circumstances under which they were made, not

6  misleading, for the reasons given in paragraphs 27-43, *supra*.  For the reasons stated in paragraphs

7  44-52, *supra*, Dawson either knew that he omitted the material facts or acted with reckless disregard

8  as to whether those facts must be disclosed in order to make his communications, in the light of the

9  circumstances under which they were made, not misleading.

10       154.    In an effort to ease the CCBS Plan's concerns over their investment in VCI, thereby

11  earning a commission on the transaction, Dawson informed the CCBS Plan that he had conducted

12  "due diligence" into the background of VCI and there was no cause for concern.  That statement was

13  deliberately false.  In fact, Dawson conducted no (or very little) due diligence into the background of

14  VCI and little to no research on viatical settlements in general.

15       155.    In making the statements listed above, and in omitting to state material facts as listed

16  above, Dawson acted with the intent to induce the CCBS Plan to act in the manner herein alleged in

17  reliance thereon.

18       156.    In reliance on these representations and without knowledge of the suppressed facts,

19  the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the

20  VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson.

21  Had the CCBS Plan known the actual facts, it would not have taken such action.  The CCBS Plan's

22  reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's

23  financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the

24  CCBS Plan with respect to this transaction.

25       157.    As a proximate result of Dawson's breach of fiduciary duty, the CCBS Plan was

26  induced to purchase 133 membership units in LLC-IG-2, at $5,000 per unit.  VCI's actual assets are

27  significantly below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-

28  IG-2 is worth considerably less.  The precise amount of the CCBS Plan' damage caused by Dawson's

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                                    30                          CCBS Plan v. Dawson
                                                                                    Case No. _____

1    fraudulent acts will be determined at trial.

2         158.    The aforementioned conduct of Dawson was intentional and despicable, so as to

3    justify an award of exemplary and punitive damages.

4         159.    WHEREFORE, Plaintiff requests relief as hereafter provided.

5                          **TENTH CAUSE OF ACTION**
                                  **Negligence**
6

7         160.    Plaintiff sets forth by reference as though fully set forth below each and every

8    allegation of paragraphs 1-159 of this Complaint.

9         161.    Dawson was the financial advisor to the CCBS Plan, and as such owed a duty to the

10   plan to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a

11   prudent man acting in a like capacity and familiar with such matters would use in recommending an

12   investment to a pension plan.

13        162.    In recommending, soliciting, and effectuating the CCBS Plan's purchase of 133

14   membership units in LLC-IG-2, for a total cost of $665,000, Dawson breached that duty.

15        163.    In particular, in recommending to the CCBS Plan that it invest in LLC-IG-2, Dawson

16   made a substantial number of material misstatements and omitted to state several material facts, as

17   detailed *supra* at paragraphs 27-43.  The true facts are detailed at paragraphs 27-43, *supra*.  In an

18   effort to ease the CCBS Plan's concerns over their investment in VCI, thereby earning a commission

19   on the transaction, Dawson informed the CCBS Plan that he had conducted "due diligence" into the

20   background of VCI and there was no cause for concern.

21        164.    Those statements were either deliberately false, or at the least, Dawson failed to

22   conduct a reasonable inquiry into nature of viatical settlements generally, and into VCI particularly,

23   that would have disclosed to him the falsity of his representations, as detailed in paragraphs 44-52,

24   *supra*.  Moreover, had Dawson conducted a reasonable inquiry into viatical settlements and VCI, he

25   would have discovered that the investment in LLC-IG-2 was extremely risky and not an appropriate

26   investment for the CCBS Plan.

27        165.    Thus, in recommending that the CCBS Plan invest in LLC-IG-2, in making the

28   statements and in omitting to state material facts, as detailed in paragraphs 27-43*, supra*, and in

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                        31                        CCBS Plan v. Dawson
                                                                       Case No. _____

1   failing to conduct a reasonable inquiry into viatical settlements and VCI, as detailed in paragraphs 44-

2   52, *supra*, Dawson failed to act with the care, skill, prudence, and diligence under the circumstances

3   then prevailing that a prudent man acting in a like capacity and familiar with such matters would use

4   in recommending an investment to a pension plan.

5         166.   In reliance on these representations and without knowledge of the suppressed facts,

6   the CCBS Plan was induced to and did pay approximately $665,000 for 133 membership units in the

7   VCI-sponsored investment vehicle known as LLC-IG-2, and paid a monetary commission to Dawson.

8   Had the CCBS Plan known the actual facts, it would not have taken such action.  The CCBS Plan's

9   reliance on Dawson's representations was justified because Dawson was hired as the CCBS Plan's

10   financial advisor with respect to this transaction and as such, Dawson owed a fiduciary duty to the

11   CCBS Plan with respect to this transaction.

12         167.   As a proximate result of Dawson's negligence, the CCBS Plan was induced to

13   purchase 133 membership units in LLC-IG-2, at $5,000 per unit.  VCI's actual assets are significantly

14   below their stated assets, and as such, the CCBS Plan's investment of $665,000 in LLC-IG-2 is worth

15   considerably less, causing damage to the CCBS Plan.  The precise amount of the CCBS Plan' damage

16   caused by Dawson's fraudulent acts will be determined at trial.

17         168.   WHEREFORE, Plaintiff requests relief as hereafter provided.

18                  **DEMAND FOR JURY TRIAL**

19         169.   Plaintiff hereby demands a trial by jury on all of the above causes of action.

20     **WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

21         1.   On the First, Second, Fifth, and Sixth Causes of Action, for an Order rescinding

22   Plaintiff's purchase of 133 investments units in LLC-IG-2 and requiring Dawson to refund to Plaintiff

23   the purchase price of $665,000.

24         2.   On the Third, Fourth, Fifth, Seventh, Eighth, Ninth, and Tenth Causes of Action, for

25   compensatory damages in an amount to be proven at trial.

26         3.   On the Third, Seventh, and Ninth Causes of action, for exemplary and punitive

27   damages in an amount to be proven at trial.

28         4.   For pre-judgment interest on all sums of money that Dawson is required to pay to

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES          32          CCBS Plan v. Dawson
          Case No. _____

1    Plaintiff, at the statutory rate from August 10, 2001, through the date of judgment.

2          5.       For post-judgment interest on all sums of money that Dawson is required to pay to

3    Plaintiff, at the statutory rate from the date of judgment through the date of payment.

4          6.       For reasonable attorneys' fees incurred by Plaintiffs in prosecuting this action, in an

5    amount to be proven at trial;

6          7.       For costs of suit incurred in this action; and

7          8.       For such other and further relief as the Court may deem just and proper.

8

9    Dated: July 16, 2004                    KENNEDY, ARCHER & HARRAY

10

11                                            By: _____

12                                                 David W. Balch

                                              Attorneys for Plaintiff

13                                            CENTRAL COAST BRAIN AND SPINE

14                                            PROFIT SHARING PLAN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kennedy, Archer
& Harray
Attorneys at Law
24591 Silver Cloud Ct.,
Suite 200
Monterey, CA 93940

COMPLAINT FOR DAMAGES                       33                       CCBS Plan v. Dawson
                                                                     Case No. _____